RECEIVED
June 17, 2021
CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____
                                    M. Trujillo
                              DEPUTY

## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## EL PASO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | EP-21-CV- 144-DCG |
| | § | |
| BOYNTON COMPANIES, INC. | § | |
| d/b/a RELYmedia & | § | |
| SCOTT BOYNTON, | § | |
| | § | |
| Defendants. | § | |

### COMPLAINT FOR TEMPORARY RESTRAINING ORDER,
### PRELIMINARY INJUCTION AND PERMANENT INJUNCTION

For its Complaint against Boynton Companies, Inc., d/b/a RELYmedia and Scott Boynton (hereinafter collectively "Defendants"), the United States of America alleges as follows:

### INTRODUCTION

1.     On March 13, 2020, then President Trump of the United States declared the COVID-19 outbreak[1] in the United States constituted a national emergency beginning March 1, 2020, pursuant to his authority under the Constitution, the National Emergencies Act, 50 U.S.C. §1601 et seq., and the Social Security Act at 42 U.S.C. §1320b-5.

2.     Defendants are engaging in and facilitating a predatory wire fraud scheme exploiting the current COVID-19 pandemic.

3.     Defendants have conducted themselves to mislead the public into believing they can provide authentic 3M 1860 N95 masks to the public. Victims of Defendants are induced into

---

[1] There is currently a global outbreak of respiratory disease caused by a novel coronavirus that has been named "severe acute respiratory syndrome coronavirus 2" (SARS-CoV-2). The disease caused by the virus has been named "Coronavirus Disease 2019" (COVID-19).

purchasing the masks, believing they were manufactured by 3M and therefore believing they are purchasing medical-grade quality masks designed to protect them from viruses like COVID-19.

4.     The claims by Defendants are false.

5.     The masks being sold by Defendants are counterfeit masks.  3M N95 masks are tested on an ongoing basis to ensure they meet filtration efficiency requirements and other performance criteria specified in applicable government regulations.  3M has strict quality controls and manufacturing standards to help ensure consistent high performance.  The masks sold by Defendants were not manufactured by 3M and therefore have not undergone the rigorous manufacturing and testing standards implemented by 3M to ensure the masks provide the protections against viruses like COVID-19 that people expect from 3M products.

6.     The United States seeks to prevent continuing and substantial injury to victims of this fraudulent scheme by bringing this civil action under 18 U.S.C. § 1345 to enjoin Defendants' ongoing wire fraud in violation of 18 U.S.C. § 1343.

## JURISDICTION AND VENUE

7.     The Court has subject matter jurisdiction over this action under 18 U.S.C. § 1345 and 28 U.S.C. §§ 1331 and 1345.

8.     Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted herein occurred in this district.

## THE PARTIES

9.     Plaintiff is the United States of America.

10.    Boynton Companies, Inc., d/b/a RELYmedia ("RELYmedia") is a Minnesota corporation.  RELYmedia is headquartered at 18178 Minnetonka Blvd., Suite 100, Wayzata,

Minnesota.  It imports customized goods and promotional items such as USB drives and other electronic devices.

11.     Scott Boynton ("BOYNTON") is the President/Owner of RELYmedia. BOYNTON's business address is 18178 Minnetonka Blvd., Suite 100, Wayzata, Minnesota.

## FRAUDULENT SCHEME

12.     In and around March or April of 2020, RELYmedia began to purchase Personal Protective Equipment ("PPE") from a supplier in China.  That supplier locates PPE from other sources in China.

13.     RELYmedia currently offers 3M 1860 NIOSH-Certified N95 masks for sale on its website.  *See*  https://www.relymedia.com/products/promotional-items/health/face-masks-and-shields/rmmf05/ (last visited June 16, 2021).

14.     The investigation revealed RELYmedia has sold or offered for sale its 3M 1860 N95 masks at between approximately $2.50 and approximately $3.40 per mask.

15.     3M's suggested end-user list price for 1860 N95 masks is $1.27 per mask. 3M's prices to its authorized distributors are less than $1.27.

16.     Genuine 3M N95 Respirator Masks contain advanced filter material and are designed to be tight fitting, forming a seal with the wearer's face, so inhaled air passes through the filter (instead of going around the edges). 3M N95 masks contain proprietary, advanced electrostatic microfiber media to capture particles. 3M's unique manufacturing process injects an electrostatic charge into the microfibers, which are arranged in an open formation, allowing for easier passage of air while also enhancing the capture of airborne particles.  3M N95 respirators are also designed to seal to the wearer's face – as fit and seal are critical to respirator performance.

17.     3M N95 respirators are tested on an ongoing basis to ensure they meet filtration efficiency requirements and other performance criteria specified in applicable government regulations. 3M has strict quality controls and manufacturing standards to help ensure the consistent high performance and consistent fit of this product.

A.      **U.S. Department of Homeland Security Seized 100,080 Counterfeit 3M 1860 N95 Masks Sold By RELYmedia in El Paso, TX on December 7, 2020.**

18.     R.E. owns Escoto Custom Brokers, Inc. ("Escoto Custom Brokers"). Escoto Customs Brokers runs a U.S. Customs bonded warehouse located at 9540 Joe Rodriguez Dr., El Paso, Texas.

19.     In approximately August of 2020, J.A.L. contacted R.E. and asked if R.E. had space in his warehouse to receive large quantities of masks for export to Mexico. R.E. advised he had sufficient space.

20.     On Friday, November 27, 2020, a shipment of 94 boxes containing 3M 1860 N95 Masks were delivered by UPS to an El Paso warehouse belonging to Escoto Custom Brokers.  On Monday, November 30, 2020, a second shipment of 45 boxes containing 3M 1860 N95 Masks were delivered by UPS to that same warehouse (collectively "the masks").  In total approximately 100,080 masks were delivered to the Escoto Warehouse.

21.     The investigation revealed the exporter of these masks was Company A.

22.     R.E. noticed irregularities with the boxes.  First, he observed the UPS shipping label was addressed to his brother, MAE. Ex. C at 2.  Second, the shipping label had a phone number of (952) XXX-4596,[2] which R.E. did not recognize.  *Id.*

---

[2] A database query revealed this phone number is linked to RELYmedia.

23.     R.E. opened a box and observed the 3M Disposable Masks had a seal reflecting that the masks were imported from Peru.  Further, R.E. did not find a packing slip in the boxes he examined.  R.E. researched the UPS tracking label and discovered the masks were imported from Hong Kong.

24.     After seeing that the masks were 3M trademarked masks, R.E. advised A.L. the warehouse would need authorization from 3M in order to export the masks to Mexico. A.L. advised R.E. they did not have an authorization letter from 3M.

25.     R.E. contacted the Food and Drug Administration ("FDA") to inquire whether he could export the masks without authorization from 3M. R.E. was advised to hold the masks for inspection.

26.     A Customs and Border Protection (CBP) Officer at the El Paso Ysleta Cargo Facility researched the shipment of 3M 1860 N95 Respirator Masks shipment. The CBP Officer found the initial shipment of 94 boxes made entry by I.T. in-bonds and were closed out with 94 separate section 321 informal entries.[3]

27.     On December 3, 2020, the U.S. Department of Homeland Security ("DHS") put a hold on the masks.  That same day, DHS issued a Detention Notice and Custody Receipt for Detained Property (Form 6051D) stating one box of the masks were being detained for possible intellectual property rights violations.  This Detention Notice was provided to R.E.

28.     On December 4, 2020, DHS received word that the masks were counterfeit and on December 7, 2020, issued a Detention Notice and Custody Receipt for Detained Property (Form

---

[3] Section 321 refers to19 U.S.C. § 1321, which authorizes the Secretary of the Treasury to "admit articles free of duty and of any tax imposed on or by reason of importation, but the aggregate fair retail value in the country of shipment of articles imported by one person on one day and exempted from the payment of duty shall not exceed an amount specified by the Secretary by regulation, but not less than . . . $800 . . . The privilege of this subdivision (2) shall not be granted in any case in which merchandise covered by a single order or contract is forwarded in separate lots to secure the benefit of this subdivision (2) . . ." 19 U.S.C. § 1321(a)(2). The low value of $576.00 per box and the fact all entries were addressed to the same consignee raised red flags regarding the shipment.

6051D) for all 139 boxes.  This Detention Notice was provided to R.E.  DHS also notified representatives of Company A that the masks were counterfeit.

29.     On December 14, 2020, a Senior Trademark Counsel for 3M confirmed the seized masks were counterfeit and did not originate from any 3M facility.

30.     On January 6, 2021, DHS issued a Notice of Seizure and Information to Claimants letter to Company A stating the masks were subject to forfeiture because they bore a counterfeit mark.

31.     3M has examined photographs of the masks and has determined they are counterfeit.

**B.     <u>RELYmedia Supplied the Masks and Is Linked to Altered SGS Inspection Reports</u>**

32.     Homeland Security Investigations ("HSI") was called to investigate the source of the counterfeit masks.

33.     Their investigation revealed Company A had purchased the masks from RELYmedia November 18, 2020, at a unit price of $2.50 per mask, totaling $250,000.00, which was paid to RELYmedia on December 3, 2020.  The investigation further revealed that a Company A representative had wired RELYmedia funds to pay for the counterfeit masks.

34.     The masks had been shipped from Hong Kong, China into the United States and had entered the United States via an in-bond shipment.

35.     An invoice for the masks from RELYmedia stated "[c]ustomer acknowledges that RELYmedia is purchasing the 3M 1860 N95 masks listed on this invoice (the "Product") from what RELYmedia believes to be an approved third-party reseller, not 3M directly.  RELYmedia has completed its own independent lab testing of the Product and believes in the authenticity of

the Product. RELYmedia has tested the product with the SGS and provided a copy of the past SGS report to the Customer."

36.     The investigation also revealed that BOYNTON had provided altered SGS inspection reports to Company A with respect to the masks.

37.     SGS S.A. ("SGS") is a Swiss company that provides inspection, verification, testing and certification services.

38.     Prior to shipping the masks to El Paso, BOYNTON provided Company A with an SGS inspection report regarding the masks.

39.     A representative of Company A contacted SGS to confirm the authenticity of the report. SGS confirmed that the report was not issued by SGS and was not authentic.

40.     BOYNTON was notified that the SGS report was not authentic.

41.     BOYNTON assured Company A that the masks were authentic. BOYNTON claimed an SGS employee working as a freelancer had prepared the report on the side.

42.     After being assured by BOYNTON, Company A moved forward with purchasing the masks from RELYmedia.

43.     The investigation revealed other altered SGS reports linked to RELYmedia.

44.     On December 14, 2020, after the masks were seized, J.A.L. provided R.E. with a second SGS inspection report for the masks.  According to the report, this inspection was allegedly performed by SGS on November 20, 2020, for Tom O'Meara at RELYMedia.  The inspection was conducted at a warehouse in Pinghu town, Shenzhen City, Guangdong, China.  The report concluded that the workmanship appearance; quantity; and style, material, and colour "conform".  The report did not comment on filtration or whether the masks were authentic 3M masks.  The "Overall Inspection Conclusion" was "Subject to client's Decision."

45.    On April 20, 2021, SGS confirmed to HSI SA Anchondo that this inspection report was an unauthorized reproduction of an SGS report and should not be relied upon for any purpose.

46.    Communications made on December 3, 2020 and obtained by HSI SA Anchondo revealed a Company A representative had forwarded a third SGS report to a third party and stated the SGS report was "from our seller" and was an "[e]xport inspection report conducted by SGS in Hong Kong, prior to exit to our El Paso facility.  This report was asked for to confirm the amounts and packaging that was being sent to us."  This report does not verify whether the inspected masks were authentic 3M masks.

47.    On April 20, 2021, SGS confirmed to HSI SA Anchondo that this inspection report was an unauthorized reproduction of an SGS report and should not be relied upon for any purpose.

48.    The communications from Company A also included an SGS Particle Efficiency Report (the "Particle Efficiency Report"),[4] and a December 2, 2020, email from SGS's Corporate Security Team (certificates@sgs.com) to BOYNTON (scott_boynton@relymedia.com) stating that the Particle Efficiency Report is a genuine SGS document (the "SGS Verification Email"). None of these documents verified whether the inspected masks were authentic 3M masks.

49.    In the communication, a Company A representative writes with respect to the SGS Particle Efficiency report and the SGS Verification Email: "We asked the supplier to send us any additional inspections that they have conducted on other lots where they have done particulate tests.  They provided us the below from a lot they sold to a Canadian buyer.  Same seller, distributor.  A different lot as that was an October production lot.  But, this gives me assurances that we are dealing with a serious legitimate seller.  Also, notice the SGS verification of the particulate test."

---

[4] The file name of the Particle Efficiency Report was "1860 SGS Particle Efficiency – Redacted (1).pdf."

50.     On April 20, 2021, SGS confirmed to HSI SA Anchondo that the Particle Efficiency Report was an unauthorized reproduction of an SGS report and should not be relied upon for any purpose.

51.     After receiving this information, HSI SA Anchondo reached out to SGS to reconcile the above-mentioned April 20, 2021 email stating that the Particle Efficiency Report was not a valid SGS document, and the SGS Verification Email, which stated that the Particle Efficiency Report *was* a genuine SGS document.

52.     On April 22, 2021, an SGS employee with the Legal & Compliance Department responded: "Further to earlier email sent via certificates@sgs.com [the Company D SGS Verification Email], there is a very simple explanation for this matter.  The document submitted... was the original digitally signed document.  The document you submitted is not genuine, it is missing the applicant details, the buyer details, the supplier details.  Any unauthorized alterations to the content or appearance of our documents is unlawful and offenders may be prosecuted. SGS will only confirm documents as genuine if they exactly match the originals.  As the 'version' of report...you submitted has been tampered with in terms of content removed, you were informed it is not genuine."

53.     On April 26, 2021, an SGS employee with the Legal & Compliance Department provided HSI SA Anchondo with an original version of the Particle Efficiency Report and confirmed it had been submitted for authentication by Scott Boynton of RELYmedia scott_boynton@relymedia.com on December 2, 2020.

54.     The original version of the Particle Efficiency Report shows a sample mask was tested on October 23, 2020.  The report was requested by and paid for by individuals who to our

knowledge have no connection to RELYmedia and to our knowledge do not appear to be located in Canada.

## C.   **BOYNTON Had Knowledge the Masks Were Seized as Counterfeit and Sought Information on How to Determine Masks Were Counterfeit.**

55.     S.C.M., a Company A representative, notified BOYNTON that the masks seized in El Paso were detained in December of 2020 as counterfeits.

56.     On or about December 10, 2020, BOYNTON contacted Customs and Border Protection Supervisor Remy Hernandez and attempted to receive details regarding the shipment of counterfeit 3M 1860 N95 masks. BOYNTON refused to provide CBP Supervisor Hernandez with any information as to who he worked for or what his interest was in the masks.

57.     HSI SA Anchondo reached out to BOYNTON later that same day.  HSI SA Anchondo identified herself and asked BOYNTON what he wanted to know about the masks. BOYNTON asked why the masks were seized and how did CBP know if the masks were counterfeit.  HSI SA Anchondo asked BOYNTON for his complete name.  BOYNTON refused to provide his name and stated he did not want to get involved and would let the parties that were involved handle the situation.  HSI SA Anchondo asked who were the parties that were involved. BOYNTON stated he would rather not say.  HSI SA Anchondo explained to BOYNTON that she would not be able to provide any information to him without knowing what his involvement was with the shipment of masks.  BOYNTON stated he would prefer not to be involved and terminated the telephone call.

58.     HSI SA Anchondo again reached out to BOYNTON on March 8, 2021. BOYNTON told HSI SA Anchondo that the name of BOYNTON's business was Boynton Companies, Inc.  RELYmedia was the trade name of the company.  BOYNTON's company was an S corporation and he had imported items for approximately twelve years.  Before the COVID-

19 pandemic, RELYmedia sold promotional items such as pens, mugs, shirts, and flash drives which were usually custom printed.  Due to the pandemic, their sales were greatly reduced.

59.     In March/April of 2020, RELYmedia began purchasing PPE from a trusted supplier out of China.  The supplier located the PPE from other sources in China.  BOYNTON could not provide information on where his supplier purchased the PPE.  BOYNTON explained he was new to the market of selling PPE and felt that he had done his due diligence in purchasing legitimate PPE to sell.

60.     According to BOYNTON, in September/October of 2020, an individual with the initials K.W. contacted BOYNTON on behalf of Company A and requested a quote for the 3M 1860 N95 masks. K.W. requested a sample of the masks on behalf of Company A and eventually arranged the purchase of the masks on behalf of Company A.  BOYNTON only communicated with Company A through K.W.

61.     BOYNTON told HSI SA Anchondo that the entire process to purchase the 3M 1860 masks took several weeks.  BOYNTON explained that samples of the masks were requested by K.W. and those samples were sent for testing.  Company A then sent the Purchase Order for the masks once the samples were inspected and passed the inspections.  BOYNTON stated the masks were inspected in China before being shipped to the United States.  BOYNTON received the lab results from the inspection conducted on the masks in China.  BOYNTON felt that he had done his due diligence in verifying the masks were authentic.

62.     BOYNTON stated each 3M 1860 mask was purchased from the supplier in China for approximately $1.60 (USD) each mask.  Company A purchased the masks from RELYmedia for $2.50 (USD) each mask.  Relymedia was paid $250,000 (USD) for the shipment of masks.

63.     BOYNTON claimed to have spoken to B.H., who worked for 3M's safety division, in December 2020.   BOYNTON explained the whole situation of the counterfeit 3M masks purchased from China.

64.     HSI SA Anchondo confirmed that BOYNTON and 3M employee B.H. had engaged in communications about counterfeit masks from on or about December 9, 2020 through on or about January 7, 2021.

65.     In these conversations, BOYNTON asks B.H. questions about validating the authenticity of 1860 N95 masks from private sellers. B.H. provided BOYNTON with the following indicators of fraud:

    a.   The masks do not meet N95 lab testing standards;

    b.   Masks with "Security Stickers", including stickers from Peru; and

    c.   1860 masks distributed from any foreign country;

66.     These emails also reference 3M's counterfeit alerts. 3M regularly publishes publicly available counterfeit alerts on its website, www.3M.com/covidfraud.  These alerts include the following information:

    i.   On December 4, 2020, 3M published its first alert relating to counterfeit 1860 N95 masks. This alert stated 3M had "been receiving increasing reports of fraud related to . . . 3M™ Health Care Particulate Respirator and Surgical Mask 1860 . . . ." The alert urged buyers "please be aware of – and on guard against – the increased risk of fraud related to model 1860 and 1870+ respirators. We strongly recommend that 3M respirators be purchased only through 3M authorized distributors, or through existing contracting vehicles (i.e., Federal Supply Schedules),

as this will provide the greatest assurance of receiving authentic product."

ii. On December 18, 2020, 3M updated its alert.  This alert stated that there was a "significant risk" that 3M 1860 N95 masks bearing lot code B20018 are counterfeit if purchased from a third party, and that they "should not be used."

iii. On January 20, 2021, 3M published an updated counterfeit alert regarding 3M 1860 N95 masks which noted that a "Peru Seal" or similar seals are an "additional indicator of potential counterfeit products." This alert also stated "All 3M model 1860, 1860S, and 1870+ respirators exported from China should be viewed as counterfeit. We do not manufacture these respirators in China." Additionally, "All shipments of 3M model 1860, 1860S, and 1870+ respirators accompanied by a TUV or SGS certification report should be viewed as highly suspicious and most likely counterfeit."

iv. On February 11, 2021, 3M published an updated counterfeit alert regarding 3M 1860 N95 masks.  This alert stated "All 3M model 1860, 1860S, and 1870+ respirators imported into the United States from any other country are likely to be counterfeit. . . . . If you have been offered these models coming from outside the United States, they should be viewed as counterfeit . . . . All 3M model 1860, 1860S, and 1870+ respirators exported from China/Hong Kong should be viewed as counterfeit. . . . Do not rely on TUV, SGS, or similar certification

reports. All shipments of 3M model 1860, 1860S, and 1870+ respirators accompanied by a TUV, SGS, or similar certification report are likely counterfeit . . . . 3M does not use a 'Peru Seal' or other similar seals (examples at right). Respirators bearing these seals are likely counterfeit."

67.     In his conversations with B.H., BOYNTON emphasized that he wants to validate the authenticity of the masks he sells.  However, he admits " . . . many private lots being sold. Some I am sure are authentic, some I am sure are not. We know of a lot that Homeland Security seized this week that has the same lot number as 1860's we have been purchasing from our seller (B20018). We do not want to be caught up in the middle of any fraud."  BOYNTON tells B.H. that he has tested the masks and "Even if *we can never fully verify authenticity*, we are committed to making sure our clients are receiving high quality product and we would never be involved with any product that does not meet N95 standards . . . ." (emphasis added).

68.     BOYNTON also confirmed to B.H. that he had read the information on the 3M COVID fraud website "multiple times..." and confirmed that he had received information that only "7 companies are authorized to sell the 1860 in the USA and they sell only to hospitals."

**D.     RELYmedia Continues to Sell Alleged 3M 1860 N95 Masks After DHS Seizure**

**i.     In Late December 2020, Masks Ordered from RELYmedia to Be Sent to Veterans Affairs Smelled Like Paint and Caused Illness.**

69.     In or about December 2020, BOYNTON began negotiating the sale of 3M 1860 N95 masks with two companies collectively referred to here as Company C, a distributor who was purchasing masks to sell to its local Veterans Affairs ("the VA").

70.     A Company C representative advised BOYNTON in a message that he had told the VA tat BOYNTON had sold "over 600K [masks] into the US already," but the VA was going to

want to know more about RELYmedia.  BOYNTON messaged the Company C representatives and wanted to make sure the VA knew about the "authenticity issues" since it was his experience that "government buyers are 100% firm on this issue…"  BOYNTON stated that he would be happy to explain to them (VA), but he wanted to make sure they were notified and had agreed to RELYmedia's terms in advance.

71.     Company C obtained sample masks from RELYmedia prior to finalizing the purchase.

72.     On December 31, 2020, a representative of Company C wrote to BOYNTON: "Scott few people they [sic] wore your masks became ill and we trying (sic) to understand what went wrong. Complaining about the chemical smell coming from the mask.  Their lungs are impacted bad."

73.     BOYNTON responded by sending a list of customer references and stated "I have never once had a quality complaint ever on any mask."

74.     On January 6, 2021, a Company C representative wrote to BOYNTON and stated: "Hi Scott we gave it to a few of our contacts and they all said there was a smell, almost like paint. We sent it to a contact that is a 3M distributor and who buys this product regularly.  From pictures he said it wasn't a real 3m1860 mask.  We sent it to him to check and verify but have not heard back yet. He is directly in touch with 3m and will let us know.  We are still waiting to hear back. I will keep you posted.  Have you had this mask checked by anyone prior to bringing in the product?"

75.     That same day, BOYNTON replied ". . . we have done dozens of tests. SGS, TUV, etc. Sold to many entities, exactly zero issues.  3M distributors are not real keen on validating

private lots either as it undercuts them."  BOYNTON then sent the Company C representative multiple reports, including a copy of the Particle Efficiency Report, mentioned *supra*.

76.     Company C ultimately did not purchase masks from RELYmedia.  When Company C informed BOYNTON they were not going to order the 3M 1860 N95 Respirator Masks from him, BOYNTON became angry and stated he had plenty of other buyers.

**ii**.     **RELYmedia's Sale of Counterfeit 3M N95 Masks to Company B, a Nursing Home.**

77.     Company B is a senior living care provider in Plattsburg, MO.

78.     On December 4, 2020, a Company B representative, B.S., ordered 1,000 3M 1860 N95 masks from RELYmedia for $3,250.00.

79.     On or about December 18, 2020, Company B received a shipment of 3M N95 masks labeled Lot B20018. The boxes containing the masks had a holographic Peru seal.

80.     The caregivers at Company B used the 1,000 masks purchased from RELYmedia.

81.     On January 8, 2021, B.S. placed another order for 1,000 RMMF05 3M 1860 N95 masks from RELYmedia for $3,250.00.

82.     Approximately two weeks later, Company B received a shipment of 3M N95 masks from Lot B20035.  The boxes had a holographic Minnesota seal.

83.     After the caregivers began using the second shipment of masks, B.S. saw an alert posted online by 3M regarding counterfeit masks.  B.S. observed that the 3M 1860 N95 Masks (Lot #B20018) he had ordered from Relymedia were listed as possible counterfeit masks on the 3M alert.  B.S. contacted the 3M hotline and the representative at 3M requested that he send pictures of the masks to 3M.  BS took pictures of one of the 3M 1860 N95 Masks remaining from the first order (Lot #B20018) and sent the pictures to 3M.  BS also took a picture of one of the 3M 1860 N95 Masks from the second order (Lot # B20035) and sent the pictures to 3M.

84.     On February 24, 2021, 3M contacted BS and informed him that the 3M 1860 N95 Masks he purchased were counterfeit masks.

85.     That same day, B.S. notified BOYNTON that 3M had confirmed the masks they had purchased from RELYmedia were counterfeit.

86.     Responding that same day, BOYNTON sent B.S. two SGS reports regarding the particulate filter efficiency of 3M 1860 N95 from Lot B20035 (Dec 29, 2020) and B20018 (Jan 12, 2021) (the "Company B SGS Reports").

87.     These reports purport to use NIOSH testing methods to test 3M 1860 masks, Lots B20035 and B20018.  The reports indicate the testing was performed for RELYmedia and indicated particle filtration efficiency at or above 98.8%.  The reports indicate testing was done on January 8, 2021 for the Lot B20035 sample, and January 16, 2021 for the Lot B20018 sample. These reports state "please be aware that this report does not check the authenticity of the sample tested/inspected.  Due to the safety risks to the general public, we recommend that you confirm the authentication of the product directly with the brand owner."

88.     SGS later confirmed that these reports were legitimate.

89.     BOYNTON also emailed the Company B representative on February 24, 2021, and stated "...we agreed to refund you in whole for both orders (receipts attached) in exchange for you to return to us the unused second order (lot code B20035 which is not on the 3M watch list) with the prepaid labels (attached).  We both agree that the first order (lot code B20018) is on the 3M watch list, and according to 3M's communication, this is not a product recall and does not mean all product with this code is counterfeit.  3M would have to personally investigate this in order to make such a determination.  In the interests of time for both of us, we agree to forgo this process,

you will not continue the conversations with 3M, and we agree to have you discard what you have left of the B20018 while still refunding you in full."

90.     On March 8, 2021, the Company B representative replied that Company B would follow 3M's guidance regarding the masks.

91.     BOYNTON responded that same day: "This is not what we discussed or agreed to. We offered to refund you in full for both orders if you returned the B20035.  You can go right to 3M's site to get the watch list:  https://www.3m.com/3M/en_US/worker-health-safety-us/covid19/covid-fraud/ .  B20035 is not on there.  As we also discussed, just because a lot number is on the list, does not mean it is counterfeit.  3M's own press release says this.  The only way to determine if counterfeit is to go through the process of submitting to 3M.  If you want to spend your time going through the whole process of verifying these, that is fine, but we will be reinstating the charges and will dispute any chargebacks unless we receive the product back.  Whether product is defective or not in the customer's mind, credit card companies always require the return of the product.  We were willing to forego this and meet you in the middle by agreeing to have you not return the B20018 but return the B20035. Please advise how you want to proceed.  If I do not hear back from you by tomorrow morning, I will assume you want to go through the 3M process and we will reinstate the charges."

92.     On March 8, 2021, the Company B representative responded in part: "After just following up with 3M on the status of the information sent to them back on 2/24/21 the same day I first contacted you regarding this matter; they say although the lot B20035 is not yet on the list, the products you sent are highly suspected as counterfeit and they will issue final determination on that to us.  Again, we purchased 3M 1860 authentic masks from your company and that's not what we received.  As I stated earlier, we will wait until 3M has made their determination. I would

highly discourage you from initiating any additional unauthorized charges to our credit card.  At this point, we are waiting to hear from 3M as stated before.  If they are legitimate, they will be returned.  If they are counterfeit, we will follow their guidance."

93.     Approximately 16 minutes later, BOYNTON responded in part: "Highly suspected as counterfeit based on what information? 3M tells all companies to buy from only 3M authorized distributors only so of course they are going to caution you when buying from us as we are not one."

94.     On April 5, 2021, 3M sent the Company B representative an email regarding Company B's purchase of masks from Lot B200035.  The email advised that products with lot number B20035 are fake and should not be used.  *Id.*

95.     On May 7, 2021, B.S. received an email from an individual using the email address don_demars@relymedia.com.  The email stated "I work for RELYmedia and we provided you with a quote a while back. I wanted to check in to see if there are any projects we can assist with. We are focused right now on two main products: 1. 3M 1860 N95 Masks.  We currently have 170,000 on the ground in Mexico City and will be doubling the amount each week.  We can also deliver new orders to anywhere in the world . . . ."

### iii. RELYmedia Continues to Make Representations to Potential Buyers About Authenticity of the Masks.

#### a. RELYmedia attempts to sell masks to DHS.

96.     On December 29, 2020, an individual using the email address don_demars@relymedia.com reached out to a DHS employee in Phoenix soliciting the sale of 3M 1860 N95 masks to the government.

97.     Demars noted RELYmedia has "a 100% reliable private seller in China with pricing in the $2.00-range.  These have been lab tested by SGS and we are happy to provide free samples."

98.     The DHS employee replied and requested a sample of the masks.  The RELYmedia representative responded, in part, "We are buying from a private seller in China.  We know there are plenty of concerns about the origin.  However, we have done independent and verifiable testing with TUV, SGS (a new one is also coming), and these have been vetted by Philips (waiting on a letter of recommendation from them, we have delivered multiple orders)."

**b. RELYmedia attempts to sell masks claiming they were from a private Hong Kong investor**

99.     On March 15, 2021, an individual using the email address lisa_boynton@relymedia.com, sent information via email about RELYmedia's N95 masks in order to solicit the sale of these masks.  This email attempts to sell "1860 OTG ["on the ground"] Mexico City, 1860 regular (not OTG)" and 3M 1860 masks "at the warehouse(Dongguan)."  It also stated "We are shipping weekly from our warehouse to warehouse in Mexico City" and "[p]lease note we are a private seller and not 3M distributor."

100.    Attached to this email was a PDF document with the file name "1860 Terms – RELYmedia (002).pdf" ("1860 Terms").  This document is dated March 12, 2021.

101.    The 1860 Terms states "Buyer acknowledges that RELYmedia is purchasing the 3M 1860 N95 respirators (the "Product") from a third-party private reseller, not from 3M or a 3M authorized distributor.  The Product is shipping from Hong Kong. RELYmedia believes in the authenticity of the Product but Buyer acknowledges that 3M will not verify the authenticity of any product unless purchased from 3M or a 3M authorized distributor and therefore accepts that authenticity of the Product cannot be verified. RELYmedia has completed its own independent lab testing of the Product with SGS and has made the report available to Buyer." *Id.*

102.    The 1860 Terms further states "The respirators being sold were originally made in the USA in early 2020.  A private investor from Hong Kong purchased these shortly after being

produced knowing the pandemic would cause demand for PPE to surge.  There were many news reports about the Chinese hoarding PPE early in 2020.  At any other time in history, buying respirators made in the USA from Asia would seem odd, but in today's global marketplace for PPE, it is very common to see lots traded all over the world.  There are no chain of custody or other documents from 3M or an authorized 3M distributor.  When these were purchased, such documents were not on anyone's radar as nobody could have predicted the market for 1860s would end up like it has." *Id.*

103.    Defendants, through their conduct and statements, represent to the public that they are offering for sale, authentic 3M masks, which are proven to protect against viruses like COVID-19.

104.    Victims suffer financial loss and risk to their personal health from the wire fraud scheme engaged in and facilitated by Defendants.  The public health is at further risk, as victims of this scheme may have falsely believed they are purchasing masks which protect them against COVID-19 infections, and in reliance on these fraudulent treatments may fail to seek appropriate medical treatment or isolation from others.

105.    Absent injunctive relief by this Court, Defendants' conduct will continue to cause injury to victims.

**COUNT ONE**
**18 U.S.C. § 1345**
**WIRE FRAUD**

106.    The United States re-alleges and incorporates each of the preceding paragraphs as though fully set forth herein.

107.    By reason of the conduct described herein, Defendants have violated, are violating, and are about to violate 18 U.S.C. § 1343 by engaging in and facilitating a scheme and artifice to

defraud and obtain money or property by means of false or fraudulent representations with the intent to defraud, and, in so doing, use interstate or foreign wire communications.  Such violation has further occurred in relation to a Presidentially declared major disaster or emergency as defined in the Robert T. Stafford Disaster Relief and Emergency Assistance Act at 42 U.S.C. §5122.

108.    Upon a showing that Defendants are committing or about to commit a violation of 18 U.S.C. § 1343, the United States is entitled, under 18 U.S.C. § 1345, to seek a temporary restraining order, a preliminary injunction, and a permanent injunction restraining all future fraudulent conduct.  The Court may also grant such other relief it deems just and proper to prevent a continuing and substantial injury to victims of the fraud scheme.

109.    As a result of the foregoing, the Court should enjoin Defendants' conduct under 18 U.S.C. § 1345.

## PRAYER FOR RELIEF

WHEREFORE, the United States requests judgment in its favor and against Defendants, including the following relief:

A.    That the Court issue an order, pursuant to 18 U.S.C. § 1345, pending a hearing and determination of the United States' application for a preliminary injunction, that Defendants, their agents, officers, and employees, and all other persons or entities in active concert or participation with them, are temporarily restrained from committing wire fraud, as defined by 18 U.S.C. § 1343, from advertising the sale of 3M masks and from selling, shipping or making available masks purported to be manufactured by 3M;

B.    That the Court issue a preliminary injunction, pursuant to 18 U.S.C. § 1345, on the same basis and to the same effect.  That the Court issue a permanent injunction, pursuant to 18 U.S.C. § 1345, on the same basis and to the same effect;

22

C.      All such further relief as may be just and proper.


Dated:  June 17, 2021                     Respectfully submitted,

                                          ASHLEY C. HOFF
                                          United States Attorney


                                           /s/ Eduardo R. Castillo
                                          **EDUARDO R. CASTILLO**
                                          Assistant United States Attorney
                                          Texas State Bar No. 03984803
                                          700 E. San Antonio, Ste. 200
                                          El Paso, Texas 79901
                                          Tel: (915) 534-6555
                                          Fax: (915) 534-3490
                                          eddie.castillo@usdoj.gov

                                          *Counsel for the United States*